**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company, solely in its capacity as representative and authorized agent on behalf of selling shareholders of Visually, Inc., <br><br> Plaintiff, <br><br> v. <br><br> SCRIBBLE TECHNOLOGIES, INC., a Canadian corporation; and Does 1 through 20. <br><br> Defendants. | Case No. _____ |

## COMPLAINT

Plaintiff Shareholder Representative Services LLC, solely in its capacity as duly authorized agent and representative of the former stockholders of Visually, Inc. ("Plaintiff" or "Sellers") brings this action for breach of contract against Defendant Scribble Technologies, Inc. ("Defendant" or "Scribble") (collectively, Plaintiff and Scribble are referred to herein as "Parties"), and alleges as follows:

## INTRODUCTION

1. Sellers bring this action to secure over $10,000,000 in damages for Defendant Scribble's willful breaches of its obligations under the parties' January 29, 2016 Stock Purchase Agreement (the "Agreement").

2. Defendant acquired Sellers' former company, Visually, Inc. ("Visually"), in exchange for approximately $20 million in stock. Half of this amount was contingent on Visually's future revenue performance, or "Earnout." To induce the transaction and the Earnout, Defendant covenanted to protect Sellers by using all commercial efforts to support and grow Visually's operations and revenues.

3. Defendant apparently had no intention of satisfying its obligations. Almost as soon as the transaction was complete, Defendant began to willfully breach its duties by shuttering Visually's marketing functions, eliminating key staff positions, reducing sales incentives and commissions, and undermining Visually's relationships with key customers. As a result, Visually's revenues fell dramatically – meaning that the Earnout, representing half of Sellers' purchase consideration, has been squandered.

4. Having been unable to cause Scribble to resolve this matter in good faith, Sellers bring this action for injunctive and compensatory relief for damages in excess of $10 million and/or distribution and constructive trust of the 2,050,000 Class A Voting Common Shares of Scribble they are owed under the Agreement.

## PARTIES

5. Plaintiff Shareholder Representative Services LLC ("SRS") is a Colorado limited liability company with its principal place of business in Denver, Colorado. Pursuant to the Agreement, SRS serves as agent and attorney-in-fact for and on behalf of Visually's selling stockholders (defined as "Sellers" in the Agreement), including to initiate legal proceedings to protect their interests.

6. Defendant Scribble Technologies Inc. is an Ontario, Canada corporation with its principal place of business in Toronto, Canada. Defendant acquired Visually under the Agreement and was responsible for protecting the Earnout as further detailed below.

## JURISIDICTION AND VENUE

7. This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Personal jurisdiction exists over Defendant because it has significant sustained contacts with New York and has purposefully availed itself of the privilege of conducting activities within New York, including without limitation through its contractual relationship with Visually herein. Additionally, the Parties have agreed that the state and federal courts located in

New York, New York have exclusive jurisdiction over any disputes arising out of or relating to the Agreement and have waived any right to object to or contest such forum.

9. Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

### A. VISUALLY'S BUSINESS

10. Visually (f/k/a Graphcast, Inc.) was founded in 2011 to provide on demand infographic tools to businesses. Visually steadily expanded its product offerings, garnering a dedicated following among its customers and strong interest from investors. Like many start-ups, Visually offered stock options to its employees to incentivize their investment in the continued success and growth of the company.

11. Visually generated millions of dollars in revenues selling content on a project-by-project basis to its growing stable of customers. By 2015, it had over one thousand freelancer designers working to create videos, infographics, ebooks, presentations, web interactions and more for more than 1,000 customers worldwide.

12. Based on its strong growth and healthy revenues from 2011 to 2015, Visually secured three rounds of funding and raised over $15,000,000 from investors.

#### 1. Visually's Marketing, Sales, and Customer Success Functions

13. Visually's platform was based on investments in marketing, sales, and account management / customer support (referred to as customer success or CS). These critical teams worked together to expand revenues with existing customers (e.g., repeat customers) and book projects with new customers.

##### a. Marketing

14. Visually's marketing team promoted the Visually brand and its products to new and existing clients through a variety of marketing channels, including advertising, content marketing, print collateral, events, online agencies, public relations and other marketing

programs. Visually employed both outbound marketing (e.g., advertising, events, print materials) and inbound marketing (e.g., website content, blogs, etc.) to generate sales leads.

15. Visually used advanced quantitative metrics and data analytics to ensure a seamless marketing to sales process for existing and new customers. The marketing program was critical to the overall success of generating revenue at Visually and the company made substantial investments in the program. For example, in 2015, Visually spent approximately $1.1 million on marketing related expenses. In detailed financial documents (the "Financial Plan"), which Visually shared with Scribble during the due diligence period, Visually forecasted that it in 2016 would spend nearly $1.5 million on marketing in order to achieve its projected revenues.

### b. Sales

16. Visually's sales team worked to convert marketing leads into revenue generating sales. In particular, marketing-driven inbound leads made up approximately ninety-five percent (95%) of Visually's sales leads and accounted for a comparable share of bookings and realized revenues from new accounts.

17. The sales team was directed and incentivized to maximize revenues from both existing and new customers. Sales team members earned commissions based on the revenues generated from their sales, with equal weight given to revenue generated from expanding relationships with existing clients and generating new clients. As a result, sales representatives were encouraged to drive revenue from all customers regardless of whether there was an existing relationship.

### c. Account Management / Customer Service

18. As discussed below, the majority of Visually's revenue came from expanding project offerings to existing customers. In order to ensure existing customer satisfaction and repeat sales, Visually employed a team of strategic account managers and customer success managers. These key personnel worked to maintain relationships with large existing accounts as well as to grow revenue from existing accounts. The strategic account managers worked with the largest, most strategic accounts, such as Oracle, Kia, LinkedIn and others. Their focus was to

obtain additional points of contact within an existing client's organization and upsell or cross sell to existing client contacts in order to grow revenues with those clients. They worked closely with customer success managers, who focused on ensuring that the content and service delivered to customers was flawless.

19. The diagram below, shared with Scribble during the due diligence period, shows how Visually's marketing, sales, and customer service worked together to retain customers and grow the company's revenues:



### 2. Visually's Sales and Growth Depended on Expanding Relationships with Existing Customers

20. Visually sold its services on a project-by-project basis. There were typically no monthly or annual commitments from clients. Therefore, earning expanded revenues from existing customers was critical to Visually's revenue growth.

21. Visually made investments sufficient to ensure that the marketing team, sales team, and customer success team had the resources necessary for a pipeline of new or expanded sales with existing clients.

22. In particular, to ensure revenue growth with existing accounts, Visually assigned a strategic account manager as well as a customer success manager to each of its largest one hundred accounts. These personnel worked with their existing contacts within the account and

5

account sponsors to gain new users and to make referrals within existing accounts. The strategy proved successful. In 2015, Visually earned the majority of its revenue from expanding its product offerings to existing clients.

### B. VISUALLY EXPLORES OPTIONS TO CONTINUE ITS GROWTH

23. Through 2015, Visually grew its customer base in large part due to its investment in marketing, sales and customer service. As with most start-ups, to continue its growth, Visually sought additional funding.

24. In mid-late 2015, Visually engaged in a dual-track fundraising and merger/acquisition process to determine the best approach to take on additional capital to fuel the projected growth in 2016 and beyond.

25. By late 2015, Visually was engaged in substantive and advanced discussions regarding additional capital or an acquisition with multiple parties, including Defendant Scribble.

### C. SCRIBBLE'S REPRESENATIONS REGARDING ITS BUSINESS AND PLANS FOR VISUALLY AND THE LOI

26. Defendant Scribble is a Toronto-based "Software as a Services" (SaaS) technology company founded in 2008 that provides software solutions for business customers. Unlike Visually, it earns revenues largely through monthly software subscriptions to business customers, often referred to as monthly recurring revenue ("MRR"). On information and belief, prior to the acquisition of Visually, Scribble did not sell products or services on a project-by-project basis.

27. Unlike Visually, which grew its revenue base by improving its products and marketing them to its existing customer and new customers, Scribble grew and continues to grow its client base, employee network, and revenues through an aggressive scheme of third party acquisitions. On information and belief, from 2014 through 2016, Defendant Scribble acquired or merged with seven separate companies.

28. While Scribble did generate MRR through its ongoing subscription services, it did not provide services to create the content its customers demanded. In late 2015, to meet that need, Scribble entered into discussions to acquire Visually, which specialized in content creation.

6

### 1. Scribble's Key Leadership Sold a Healthy Business Run Effectively by Experienced Professionals

29. On or about December 1, 2015, Scribble's CEO Vince Mifsud travelled to San Francisco, California and presented an investor overview to Visually's board of directors. Mifsud described a growing business with strong relationships with its customers. Mifsud represented, among other things, that Scribble had grown steadily over the prior seven quarters, very high gross margins, a negative net revenue churn rate, and retained over 90% of its clients during the previous seven quarters.

30. Mifsud's representations painted a rosy picture of Scribble's revenues and growth, which suggested that it had the resources and capabilities to integrate Visually into Scribble's broader product offerings without curtailing the amount of resources that would be available to continue Visually's growth, *i.e.*, its marketing, sales, and customer service. Indeed, Mifsud represented that post-acquisition Scribble would provide a sustaining investment amount to ensure that Visually had the resources necessary to reach its projected revenue goals for 2016 and beyond.

31. In or about November and December 2015, Mifsud further represented that key Visually personnel would be retained by Scribble post-acquisition and continue to have leadership roles with respect to the Visually business. For example, Mifsud assured that the Visually CEO would continue to serve as General Manager of Visually and retain responsibility of the Visually profits & loses. Similarly, Mifsud assured that the heads of Visually's sales, marketing, and customer service teams would continue to lead those teams and focus on Visually's products post-acquisition. The underlying assumption of the acquisition was that Visually would operate as a separate brand within Scribble's product offerings and that both companies would benefit by cross-selling products and integrating platforms.

32. These representations were a material reason Visually's employees and stockholders agreed to the acquisition. Yet none of them turned out to be true.

### 2. Based on Scribbles Representations Visually Stopped Discussions With Other Merger/Acquisition Opportunities

33. Based on Scribble's representations and following a period of negotiations, Scribble submitted to Visually a letter of intent of proposed acquisition, dated December 2, 2016 (the "LOI").

34. The LOI outlined the basic framework of a transaction that included aggregate consideration of a maximum of 4,100,000 Purchaser Shares to be paid to stockholders of Visually.

35. Half of these shares (or 2,050,000 Shares) would be paid upon closing with a small holdback. The remaining 50% of the purchase price would be paid as an Earnout in proportion to the amount Visually's revenue exceeded $4,000,000 and up to $7,000,000 for the twelve months from January 15, 2016 to January 15, 2017 ("the Earnout Period"). The Earnout numbers were based on Visually's projected revenues (and projected investment in sales, marketing and customer service) as outlined in the Financial Plan Visually provided to Scribble during the due diligence period.

36. The Parties recognized that Scribble's continued investment in Visually was necessary to ensure that Visually had the resources necessary to achieve its revenue targets during the Earnout Period.

37. Based on Mifsud's representations, the structure of the transaction outlined in the LOI, and the mutual understanding of the Financial Plan, Visually ceased discussions with other suitable merger or acquisition partners and continued discussions exclusively with Scribble. These discussions culminated in a Stock Purchase Agreement, dated January 29, 2016.

### D. THE STOCK PURCHASE AGREEMENT

38. On January 29, 2016, Scribble, on the one side, and Visually's stockholders, SRS (solely in its capacity as the Sellers' representative) and Visually, on the other side, entered into the Agreement. Consistent with the LOI, the Agreement called for aggregate consideration of 4,100,000 Purchaser Shares (defined as Class A Voting Common Shares in the capital of

Scribble), up to 2,050,000 of which to be paid based on achieved revenues during the Earnout Period.

39.     The key provision of the Agreement for the purposes of this dispute is § 2.6(a), which ensured the Sellers that Scribble could not sabotage their right to the Earnout by pulling funding for Visually products or de-incentivizing the sale of Visually's products to its most significant customer base—its existing customers.

40.     Section 2.6(a) provides as follows (emphasis added):

> 2.6  Earnout Period; Earnout Adjustment
>
> (a)  <mark>During the Earnout Period, the Purchaser shall use commercially reasonable efforts to operate the Business within the Company Group with the goal of maximizing the Achieved Revenue, including the implementation of sales incentive plans and quotas to support the Achieved Revenue goals on the same basis as the Purchaser's other products and offerings;</mark> provided that the Purchaser shall be entitled to integrate and operate the Business, in each case, within the Company Group, as is necessary to maximize the overall growth and profitability of the Company Group, taken as a whole  The Parties expressly acknowledge that the Purchaser and its Affiliates currently operate a business and, following the Closing, will continue to operate such business and may acquire and/or develop other businesses in the future (which will require the allocation of resources by the Purchaser) and that such actions shall not be deemed to interfere with or impede the ability of the Sellers to earn the Aggregate Earnout Amount.

41.     Scribble knew what Visually had been spending on marketing, sales and customer service in previous years (over $2 million in each of 2014 and 2015) and what it projected it would need to spend to hit its projected revenue goals going forward.  The Financial Plan Visually disclosed during the due diligence period showed that Visually expected to spend nearly $1.5 million on personnel, consultants, and other related marketing expenses in 2016 in order to hit its projected revenues.  It also showed that Visually planned to nearly double the headcount of its customer success team by the end of 2016. It also planned to double the number of strategic account managers by the end of 2016. The efforts of the customer success managers and strategic account managers were projected to generate significant bookings from existing accounts, equaling 64%% of the total for 2016.

42.     Indeed, Visually's P&L for 2014 and 2015, which included detailed financial information regarding its expenses were attached as schedules to the Agreement.

9

43.     The resulting Agreement thus contemplated that during the Earnout Period, Scribble would dedicate resources to the Visually business – consistent with prior representations, the LOI, and the Financial Plan – so as to maximize the Achieved Revenue during the Earnout Period.

44.     The Agreement also contemplated what would occur if Scribble elected not to comply with its obligations to use commercial reasonable efforts vis-à-vis Visually products. Pursuant to Section 2.6(g), Sellers would be entitled to receive 2,050,000 of Class A Voting Common Shares in Scribble if Scribble did not comply with section 2.6(a):

> (g)   Notwithstanding anything to the contrary in this Section 2.6, the Purchaser shall have the right, in its sole and absolute discretion, to elect, by providing notice to the Sellers' Representative, not to comply with any covenant set out in Section 2.6(a), in which case the definition of "Achieved Revenue" shall be $7,000,000, the definition of "Aggregate Earnout Amount" shall be deemed to be 1,681,000 Purchaser Shares, the definition of "Aggregate Earnout Carveout Amount" shall be deemed to be 369,000 Purchaser Shares and the "Earnout Payment Date" shall be deemed to be five Business Days after January 15, 2017.

45.     As discussed below, Scribble reneged on its obligations before the ink on the Agreement was dry.

### E.      SCRIBBLE DISMANTLES VISUALLY'S OPERATIONS AND DESTROYS ITS BUSINESS

46.     After the parties' acquisition closed, Scribble almost immediately began to disregard its repeated representations to Sellers by jettisoning and removing funding for the core Visually sales and service functions that were necessary to maximize Achieved Revenue during the Earnout Period.

47.     One of the first signs that Scribble would renege on its promises was the abrupt demotion and reassignment of Visually's prior CEO, who had been slated to continue as Visually's acting General Manager. Instead, he was stripped of any control over the marketing, sales, and customer service functions and reassigned to assist corporate development for Scribble.

48.     With Visually's CEO out of the way and its leadership hobbled, Scribble's CEO, Mifsud, took exclusive control over Visually products. In short order, he systematically stripped the resources previously promised to Visually's marketing, sales, and customer service teams.

49. Mifsud implemented policies to ensure Visually would not achieve its target revenue during the Earnout Period, thus avoiding Scribble's obligation to pay the Earnout amount to the Sellers.

### 1. Scribble Dismantles Visually's Marketing Functions

50. After the businesses were integrated, the former Vice President of Marketing for Visually was assigned to serve as Vice President of the integrated business and was tasked with bringing the Scribble marketing functions up to speed rather than continuing to build the Visually brand. Mifsud and other leadership at Scribble directed Visually's key marketing personnel to virtually combine all marketing efforts under the Scribble brand.

51. In the integrated business, all marketing resources were directed toward Scribble products to make up for years of mismanagement. For example, prior to the acquisition, Scribble did not possess any reliable data regarding basic marketing metrics like website traffic, leads, sales-qualified leads, and pipeline opportunities. Scribble had virtually no content marketing platform and did not track leads, sourcing, or use data to develop its marketing process. Scribble did not effectively track leads or sourcing and used data that was in disarray and oftentimes conflicting. Scribble had attempted to develop its own internal customer relationship management ("CRM") systems, and ultimately abandoned that effort at the recommendation of the former Visually Vice President of Marketing so that Salesforce.com could be implemented.

52. With Visually's marketing team purloined to build Scribble's marketing function from the ground up, marketing for Visually products ground to a halt.

53. For example, prior to the acquisition, Visually operated a successful and active online blog that drove traffic from existing and new clients to sales representatives. After the acquisition, Scribble instructed marketing personnel to only use a Scribble branded blog that was infrequently updated and did not have the same success in conversion to sales.

54. Prior to the acquisition, Visually generated significant sales leads by attending trade shows including the Adobe Conference and the Marketo Conference. After the acquisition,

11

Scribble discontinued any Visually branded attendance at any trade show. Any trade show attendance was done under the Scribble brand.

55. On information and belief, post-acquisition Scribble dedicated *less than twenty percent* of the marketing spend contemplated in the Financial Plan on Visually related marketing efforts.

56. These commercially unreasonable efforts decimated Visually's marketing function. The result was predictable: lead volume on Visually products dried up and revenues followed suit.

### 2. Scribble Eliminates Incentives to Sell Visually Products

57. Just as he had with Visually's marketing function, Mifsud implemented policies and procedures for Visually's sales personnel that took away any incentive to sell to existing customers—which accounted for the majority of Visually's revenues pre-acquisition.

58. After the acquisition, Mifsud waited months before providing certain sales personnel with a plan that dictated how sales commissions and bonuses would be calculated. When Scribble finally announced a plan, it discouraged sales personnel from spending time and energy on sales of Visually products to existing customers. And to add insult to injury, Scribble continually changed the policies and delayed payments to employees selling Visually products. Sales bonuses for Visually employees were consistently delayed and the underlying calculations were frequently inaccurate or failed to reflect the signed commission plans.

#### a. The Commission Plan Favored Scribble Sales Over Visually Sales.

59. The plan provided commissions for sales to *new* accounts, but significantly lower commissions for sales to *existing* accounts. The result was that sales personnel were incentivized to sell Scribble products (the majority of which were subscription based sales to new customers) over Visually products (the majority of which were project based sales to repeat customers). This policy clearly breached Scribble's obligation to "implement[] sales incentive plans and quotas to

support the Achieved Revenue goals on the same basis as the Purchaser's [Scribble's] other products and offering." Agreement § 2.6(a).

60.     Throughout 2016, Scribble provided several definitions of *new* versus *existing* accounts.  The changes caused confusion and uncertainty.  Predictably, sales personnel focused their efforts on selling to new customers because they could be certain that those sales would count toward their commission, while they could not be so certain that sales to existing accounts would count.  The sales compensation policy damaged client relationships with Visually's large enterprise customers, and revenues from such clients stalled or fell off.

### b.     The Bonus Plan Favored Scribble Sales Over Visually Sales

61.     Even among sales to existing accounts, Scribble ensured that Visually product sales were not prioritized by implementing a bonus structure that weighed heavily in favor of selling Scribble products over Visually products.  This policy, like the commission policy, violated Scribble's obligations under the Agreement.

62.     For example, Visually employees who had previously focused exclusively on strategic account management were now expected to spend all of their time on sales to new clients.  This shift had two negative effectives on Visually sales.

63.     First, these account managers could no longer spend as much time developing and cementing relationships with existing clients, from whom the lions' share of Visually revenue came.

64.     Second, the bonus plan for these employees—who were for the first time responsible for closing sales, skewed heavily in favor of sales of Scribble products:  88% of the bonus was keyed to sales of Scribble products, while only 12% was keyed to sales of Visually products. Thus, Scribble sought to further impede Visually revenues by incentivizing sales of Scribble products over Visually products to existing accounts.

### 3.     Scribble Prohibits Displays of the Visually Brand

65.     Scribble also implemented policies and procedures that prohibited the prominent featuring the Visually brand or logo in customer facing documents, presentations, and sales

13

materials. For example, all sales decks were branded by Scribble and deemphasized the Visually brand and products. As discussed above, Scribble leadership barred the use of the Visually brand at trade shows and shut down further use of the Visually blog, both of which had successfully increased Visually's brand awareness and led to sales generating leads in the past.

### 4. Scribble Eliminates Customer Success and Account Management Roles

66. Prior to the acquisition, Visually relied on a team of customer success and strategic account managers ("CSMs") to maintain relationships with existing clients (usually large enterprise accounts) and worked hand-in-hand with the sales team to drive new revenue from these existing accounts.

67. After the acquisition, however, Scribble actively attempted to frustrate these roles, impeding Visually's revenues from large existing accounts.

68. As discussed above, Scribble forced CSMs to shift focus away from servicing existing clients (their key value-add to Visually's team) and towards explicitly driving renewals from Scribble clients.   More significantly, Scribble all but eliminated the CSM function for Visually products, shifting them almost entirely to Scribble products.  Instead, virtually all customer service for Visually products came from the Scribble customer service model premised on maintaining MRR from subscription customers rather than expanding revenue through additional products to project based customers. This hit Visually's numbers particularly hard because the majority of Visually revenues came from leveraging relationships with existing customers.

69. Additionally, CSMs were spread too thin to successfully service clients.  Pre-acquisition, CSMs might be responsible for serving forty separate Visually accounts.  Post-acquisition, the few remaining CSMs were responsible for serving as many as one hundred accounts.

**F.     Sellers Have Suffered Damages as a Result of Defendant's Conduct**

70.     The central assumption of the Agreement was that Scribble would use commercially reasonable efforts to maximize Visually's Achieved Revenues post acquisition. The Sellers relied on Scribble's commitment to use these efforts, as up to half of their shares in Scribble depended on it.

71.     Notwithstanding its obligations, and its understanding that obtaining the Achieved Revenues required a sustained investment in marketing, sales, and customer service for Visually products, Scribble systematically stripped funding, personnel, and other resources away from Visually and de-incentivized sales of Visually products.  The reasons for this misconduct are clear—Scribble wanted to acquire Visually for half-price while exploiting the well-developed Visually resources to expand its own brand and offerings.

72.     The results of Scribble's misconduct and breaches are equally clear.  Scribble caused Visually to dramatically miss the Achieved Revenue target of $7 million and deprive the Sellers of half of the value of the purchase price they were promised in selling their company to Scribble.

**G.     Sellers' Good Faith Efforts to Amicably Resolve the Dispute**

73.     As the Earnout period progressed, Sellers became aware of Scribble's failure to use commercially reasonable efforts to operate Visually with the goal of maximizing the Achieved Revenues.

74.     On August 31, 2016, Sellers provided notice to Scribble of its failure to fulfill its obligations under the Agreement. Scribble responded through counsel on September 9, 2016 denying its breach of the Agreement.

75.     Sellers provided additional notice on September 23, 2016 of Scribble's failure to use commercially reasonable efforts to operate Visually and requested inspection of document and information to further develop facts supporting its assertion. Scribble responded through counsel on November 11, 2016, again denying any breach and providing certain limited

documents and information that failed to address the concerns in Sellers' August 31 and September 23 letters.

76. Having failed to reach an agreement regarding Scribble's obligations under the Agreement, Sellers are left with no choice but to bring this action to enforce their rights and secure relief for Defendant Scribble's breach of the Agreement.

77. Sellers seek to recoup millions of dollars in damages and place a constructive trust over the 2,050,000 Class A Voting Common Shares of Scribble they are entitled to under the Agreement.

## CLAIM FOR RELIEF

### BREACH OF CONTRACT

78. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

79. Sellers and Defendant Scribble entered into the Agreement, a binding and enforceable contract.

80. Sellers performed all or substantially all of their obligations under the Agreement.

81. Defendant Scribble breached its obligations to Visually stockholders under the Agreement as alleged above, including without limitation by failing to use commercially reasonable efforts to operate Visually with the goal of maximizing the Achieved Revenues including the implementation of sales incentive plans and quotas to support the Achieved Revenue goals on the same basis as Scribble's other products and offerings.

82. As a result of Defendant Scribble's willful breaches of the Agreement, Visually stockholders have been damaged in an amount to be proven at trial but in excess of $10,000,000 and lost value of 2,050,000 Class A Voting Common Shares, together with all recoverable costs and interests related thereto.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Shareholder Representative Services LLC on behalf of Sellers of Visually, Inc., prays that the Court issue the following relief:

A. An order adjudging and decreeing that Defendant has engaged in the conduct alleged herein;

B. Damages in an amount to be proven at trial but estimated to be in excess of $10,000,000.

C. A declaratory judgment adjudging and decreeing that Sellers are entitled to 2,050,000 Class A Voting Common Shares in Scribble.

D. A constructive trust over 2,050,000 Class A Voting Common Shares in Scribble and an order enjoining Scribble from transferring, selling, encumbering, or otherwise disposing of such shares or entering into any agreement or understanding, written or oral, regarding such shares.

E. Pre- and post- judgement interest at the lawful rate.

F. All allowable attorneys' fees and costs.

G. All such other and further relief as the Court may deem just, proper, and equitable.

Dated: New York, New York
       January 13, 2017

                                        **BRAUNHAGEY & BORDEN LLP**

                                        By: _____

                                        J. Noah Hagey, Esq.
                                        Andrew Levine, Esq.
                                        Amit Rana, Esq. (*pro hac vice* pending)
                                        BraunHagey & Borden LLP
                                        80 Broad St., Suite 1302
                                        New York, NY 10004
                                        Tel./Fax: (646) 829-9403
                                        hagey@braunhagey.com
                                        levine@braunhagey.com
                                        rana@braunhagey.com

                                        *Counsel for Plaintiff Shareholder*
                                        *Representative Services LLC*